```
                                                          FILED
                                                    IN CLERK'S OFFICE
                                               U.S. DISTRICT COURT, E.D.N.Y.
```
★ JUN 15 2005 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

PATRICK H. BARCLAY,                    MEMORANDUM,
                                                               ORDER AND
                     Petitioner,               JUDGMENT
                                                               02-CV-2184 (JBW)
           -against-                             03 Misc 0066

ELIOT SPITZER,

                     Respondent.
------------------------------------------------------x

APPEARANCES:

For Petitioner:

     Mark S. DeMarco, Esq.
     2027 Williamsbridge Road
     Bronx, N.Y. 10461

For Respondent:

     John O'Mara
     Jane S. Meyers
     Assistant District Attorneys
     350 Jay Street
     Brooklyn, N.Y. 11201

JACK B. WEINSTEIN, Senior District Judge:

## Table of Contents

I.      Introduction ................................................................. 2
II.     Federal Proceedings ......................................................... 2
         A.     Original Trial Level Proceedings and Opinion ........................... 2
         B.     Appellate Proceedings ................................................. 3
         C.     First Evidentiary Hearing After Remand ................................ 4
         D.     Second Evidentiary Hearing After Remand .............................. 4
III.    Analysis of Claims .......................................................... 5
         A.     Physical Capacity ..................................................... 5
                1. Based on the State Record and First Post-Remand Evidentiary Hearing ..... 5
                2. Based on the Second Post-Remand Evidentiary Hearing ................ 13
                3. Reasonable Decision of State Trial Counsel ........................... 14



|   |   |   |
|---|---|---|
| B. | Conflict of Interest | 14 |
| C. | Skillful Defense | 14 |
| D. | Evidence of Guilt | 16 |
| E. | Danger in Uncritical Acceptance of *Mea Culpa* Claims of State Counsel | 16 |
| F. | Advantage of New York State's Over Court of Appeals for the Second Circuit's Approach. | 17 |
| IV. | Conclusion | 18 |

## I. Introduction

The district court dismissed this petition for a writ of habeas corpus, denying a certificate of appealability. As directed by the Court of Appeals for the Second Circuit, an evidentiary hearing was held upon remand. *See Barclay v. Spitzer*, No. 03-2758-pr, slip op. at 2 (2d Cir. Sept. 23, 2004). The petition is once again dismissed, as without merit, but a certificate of appealability is granted in view of the interest of the Court of Appeals in the case.

This litigation reveals the need for great care before a competent attorney's representation in a state criminal prosecution is characterized as inadequate by federal courts in a habeas proceeding. In a case like the instant one the gestalt-like test for counsel competency of the New York Court of Appeals seems more useful in solving the problem of whether the defense was acceptable under notions of due process than does the federal mechanical-like rule applied by the Court of Appeals for the Second Circuit. *See Henry v. Poole*, No. 03-2884, 2005 WL 1220468, at *18-*21 (2d Cir. May 24, 2005) (discussing why it is bound by its own precedent not to accept the New York rule and apply appropriate deference standards to New York court decisions).

## II. Federal Proceedings

A. <u>Original Trial Level Proceedings and Opinion</u>

This petition for a writ of habeas corpus after a state conviction in a rape case was filed on April 8, 2002. The case was reassigned to the undersigned on April 25, 2003 as part of a

review of five hundred state habeas cases. After consideration of the record and oral arguments, the petition was dismissed and a certificate of appealability was denied. *See Barclay v. Spitzer*, Nos. 02-CV-02184, 03-Misc-0066, 2003 WL 24053776 (E.D.N.Y. Sept. 17, 2003), deemed incorporated in the present memorandum.

B.  Appellate Proceedings

On appeal the Court of Appeals for the Second Circuit granted a certificate of appealability. *See Barclay v. Spitzer*, No. 03-2758-pr, slip op. at 1 (2d Cir. Sept. 23, 2004). It directed the trial court to "conduct an evidentiary hearing or otherwise supplement the record," allowing state trial counsel to directly respond to appellant's claims. *Id.* at 2. The record was considered "insufficient" on the following two issues:

> (1) whether trial counsel was ineffective because he failed to call appellant's doctor as a witness to testify that appellant was not physically capable of perpetrating the attack described by the complaining witness; and (2) whether trial counsel was ineffective because the defense team was conflicted by the association of the lawyer and investigator with the complaining witness, 28 U.S.C. § 2253[(c)].

*Id.* at 1. These claims had been dismissed as "frivolous" by the trial court. *See* 2003 WL 24053776, at \*19-\*20, \*22.

The appellate court explained its decision as follows:

> While failure to call a witness "usually falls under the realm of trial strategy that [the Court is] reluctant to disturb," this decision must be "grounded in some strategy that advances the client's interests." *Eze v. Senkowski*, 321 F.3d 110, 129 (2d Cir. 2003). In this case, counsel admitted at the sentencing hearing that he did not call the doctor as a witness because he failed to adequately prepare for trial and, thus, the failure to call the doctor apparently was not part of a reasonable trial strategy. *See Pavel v. Hollins*, 261 F.3d 210, 217-18 (2d Cir. 2001) (counsel's failure to call any defense witnesses was not part of a trial strategy where counsel admitted that he had not prepared a defense because he had believed that the prosecution's case was weak and that his motion to dismiss after the close of the

-3-

prosecution's case would be granted). Additionally, to demonstrate that counsel was ineffective because of a conflict of interest, the petitioner must establish that "(a) counsel actively represented conflicting interests, and (b) such conflict adversely affected his lawyer's performance." *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003). The district court should conduct an evidentiary hearing or otherwise supplement the record to allow appellant's trial counsel to directly respond to appellant's claims. *See Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (the district court may use other methods to supplement the record, such as requesting affidavits from counsel, rather than conducting an evidentiary hearing). After receipt of a direct response by trial counsel, the district court may determine if counsel's performance in these areas constituted ineffective assistance of counsel under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984).

*Id.* at 1-2.

C. <u>First Evidentiary Hearing After Remand</u>

The district court appointed counsel for petitioner. Following counsel's repeated requests for adjournments, an evidentiary hearing was held on May 4, 2005. State counsel for petitioner appeared in person and was subjected to examination and cross-examination. Petitioner was present by telephone.

State counsel was credible. His testimony is credited. The hearing and documents support the conclusion that the case for the defense was tried skillfully, without any conflict of interest, and with an appropriate trial strategy that would support a decision not to call a doctor on defendant's behalf. Were the case retried, the trial would probably be conducted by any other competent defense counsel in essentially the same way without violating petitioner's constitutional rights.

D. <u>Second Evidentiary Hearing After Remand</u>

A second evidentiary hearing was held in order to obtain testimony of the doctor that state defense counsel allegedly neglected to call at the state trial. That doctor was dead. A possible

successor as treating physician was also dead. An attempt was made by counsel to obtain petitioner's medical records after consulting with his family. By letter of June 8, 2005 his counsel informed the court:

> Despite repeated attempts, we have been unable to locate any of Mr Barclay's medical records. Accordingly, it is respectfully requested that Your Honor close the record on the evidentiary hearing conducted with respect to the above-referenced case.

This second hearing was not helpful in resolving the questions posed by the Court of Appeals. See *supra* Part II.B, *infra* Part III. A. 2.

### III. Analysis of Claims

A. <u>Physical Capacity</u>

1. <u>Based on the State Record and First Post-Remand Evidentiary Hearing</u>

The petitioner, who usually walked with a cane, had a treating physician, one Doctor Ernesto Lee, who, petitioner claims, would have testified that petitioner was not capable of the physical activity -- chasing complainant about his apartment and the like -- that the state trial testimony of the complaining witness reflects. During pre-trial and early in the trial, Doctor Lee was out of the country. *See* Tr. of May 4, 2005 Hearing ("May Hearing") at 14, 17-18. Defense counsel could not interview him before trial and, following his practice of never calling a witness without preparing him, he did not call Doctor Lee as a defense witness on the last days of trial when he was theoretically available, having just returned to the City. *Id.* at 18, 19-20.

After trial, but before sentencing, in a motion pursuant to New York State Penal Law section 330.30, defense counsel moved to set aside the verdict on the ground that he was remiss

in not having called Doctor Lee at the trial. *Id.* at 17, 20-22. Counsel had determined after trial that Doctor Lee was of the opinion that petitioner was "not physically capable of engaging in the acts" described. *Id.* at 15. While state counsel suggested at the argument of the state post-trial motion that his failure represented neglect, possibly constituting a constitutional violation, this rhetoric did not represent his real evaluation, but was essentially a ploy to obtain a new trial by a lawyer more devoted to his client than to his own reputation. *Id.* at 28, 42-43, 45-47.

The trial record reveals a talented attorney who employed his skills well on petitioner's behalf. As indicated below, petitioner's insistence on making key defense decisions probably served him badly. For example, he was offered probation by the prosecutor on a plea of guilt, but he turned it down against his lawyer's advice. *Id.* at 26. He also refused to have called on his behalf as character witnesses a number of trial attorneys for whom he had worked. *Id.* at 46.

Part of the relevant testimony of state trial counsel at the May Hearing was as follows:

Q [by respondent's counsel]: Mr. Wright, during your discussion with Doctor Lee [after trial but before sentence], did you provide him a transcript of the testimony of the victim in this case?

A: I do not believe that I did.

Q: Going back to the actual trial itself, do you recall that following the defendant's testimony as to his physical condition and injuries, the prosecution attempted to have the Court allow a doctor to testify as to what limitations those conditions would place upon his ability to perform the acts alleged?

A: No, I don't.
But I - -

THE COURT: It's in the record. They attempted to have a rebuttal witness. You objected. Then the Court sustained your objection.

THE WITNESS: I'm sorry for talking over you, Judge.

Q: Would it refresh your recollection as to what occurred if I showed you the transcript, particularly starting at page 591?

THE COURT: What's the point? I have stated what happened.

MR. O'MARA: Okay. May I proceed then and ask follow-up questions?

THE COURT: Go ahead.

Q: Do you recall whether that was a determination on your part to prevent medical testimony that might be unfavorable to your client?

A: No.
My objections to that, that type of testimony, would have been based, number one, on improper rebuttal, perhaps on relevance grounds. But in no way did I think that that type of testimony would be in any fashion damaging if the Court decided to allow it because I thought that it was plain to the jurors, I believe, that Mr. Barclay walked to the jury box - - excuse me - - the witness box with a cane. He had, to the best of my recollection been using the cane during the entire proceeding, and if my memory serves me correctly, he may have even been taking some analgesics for the pain. So I had no concern whatsoever that medical testimony would in any way refute the fact that Mr. Barclay's condition was not real, that he was feigning his injuries.

Q: It is correct to [say], though, that you prevented through your objection testimony from a medical expert relating to the conditions that your - - that Mr. Barclay had described on the stand?

A: Yes, that is true.

MR. O'MARA: Thank you.
I have no further questions.

MR. DEMARCO: Nothing, Judge.

THE COURT: As I read the record, the defendant Barclay weighed about one hundred fifty pounds and was about of medium height.
Is that your recollection?

THE WITNESS: Mr. Barclay was a slight individual, yes.

THE COURT: The testimony was that he worked in part as a custodian of this church property?

THE WITNESS: Yes.

THE COURT: One of the witnesses indicated that he moved furniture and did other things?

THE WITNESS: Yes.

THE COURT: You observed the defendant over a period of years, although intermittently, when you used his services from time to time. Correct?

THE WITNESS: That is correct, Judge.

THE COURT: Was he capable of moving about New York and doing what you required?

THE WITNESS: Well, I mean, he got about. You know, I don't know how well he got about. He was - - he did what I asked him to do in a workmanlike and capable fashion. He wasn't carrying bales of paper or anything like that. So - -

THE COURT: But he was not incapacitated?

THE WITNESS: No, no.

THE COURT: The jury observed that as well?

THE WITNESS: I would imagine that they did, yes.

THE COURT: Now, apart from the Lee problem raised by the Court of Appeals, are you satisfied that your defense met adequate Strickland requirements?

THE WITNESS: I am convinced that my defense exceeded any requirements that the Court may have imposed in its Strickland ruling.
   As I said earlier, I believe during Mr. DeMarco's questioning of me, I knew the case back and forwards. I mean, that's what I do, Your Honor. I do trials.

THE COURT: How many trials had you conducted roughly in criminal cases up to that point?

THE WITNESS: This was 1997. It would be difficult for me to say, but I can answer you in this way, Your Honor.
   I average - - at that point I averaged probably four to six trials a year.

THE COURT: Four to six?

THE WITNESS: Right.

THE COURT: You had, I take it, done at least thirty trials?

THE WITNESS: That would be a conservative estimate, I think.

May Hearing at 39-43.

    Questioning of state trial counsel continued further:

THE COURT: The Court of Appeals considered the record insufficient. I had dismissed the petition and on the issue of representation I said it was frivolous, the complaint against you. But the Court of Appeals thought the record insufficient and it asked for this Court to rehear, by evidence or other means, the following issues:
    "One, whether trial counsel was ineffective because he failed to call appellant's doctor as a witness to testify that appellant was not physically capable of perpetrating the attack described by the complaining witness; and two, whether trial counsel was ineffective because the defense team..."
    What was the team?
    Did you have another attorney?

THE WITNESS: There was no team, Your Honor.

THE COURT: Okay.
    "... was conflicted by the association of the lawyer and investigator with the complaining witness."
    As to the second, I take it, there is no question, there is nothing to it?

THE WITNESS: No issue at all regarding that.

THE COURT: Okay. Your view, as I understand it, was that because this was a credibility conflict, you thought the defendant would probably be acquitted, correct?

THE WITNESS: That is correct.

THE COURT: As I understand it, [in] at least one of your appearances before a state judge, you in effect accused yourself of not having rendered an appropriate defense when you didn't believe that was the case, but you did it to assist your client, is that right?

THE WITNESS: That is correct.

THE COURT: Is there anything in your testimony today that is designed - - and I don't use this in a pejorative way - - to support the petitioner's view that he was inadequately represented because of your obligation towards a former client?

THE WITNESS: Your Honor, if I understand your question, are you asking me do I think that there is any merit to - -

THE COURT: No. I am not asking that.

I am asking you whether anything in your testimony today is skewed towards a finding of inadequacy because you think you have a continuing obligation to protect a former client, so that you want to help him in this proceeding?

THE WITNESS: Your Honor, I mean, that's not an answer that I can - - it's not a question, rather, that I could answer in a yes or no fashion.

I do think that I have an obligation to Mr. Barclay and my obligation is based upon a number of factors.

Number one, as an attorney and officer of the court, but also I had a personal relationship with Mr. Barclay.

I think that if I had to try the case over today, I probably would have tried it in the same fashion. I certainly would have liked the opportunity to call Doctor Lee as a witness, but my answers here today have been totally truthful. I believe that I did the best job that I could have done for Mr. Barclay, given the circumstances.

Certainly if Mr. Barclay had been - - Mr. Barclay was, and I guess he still is, a prideful kind of a guy. I said earlier, he was reluctant to involve other people in his defense because one of the things that we had talked about was calling other attorneys that he had worked with as character witnesses and he didn't want them involved.

There was a great deal of reluctance on Mr. Barclay's part to, again, involve people outside of the general circle, so the information about Doctor Lee was actually late in coming.

But again, Your Honor, I believe that I did the absolute best job I could have done for Mr. Barclay under the circumstances.

Sexual assault cases are, in the best of worlds, difficult cases to try. As I said, if I had to try this case over again, I probably would have tried it in the same fashion. I can't think of anything that I might have done differently. I'm sure that there are things that could have been done differently, but in total, I think that I did the best job that I could have done for Mr. Barclay, and my answers have not been skewed to assist him, although I would like to do that if I could.

THE COURT: I take it from what you say that even had Doctor Lee been available, there was a substantial possibility that the defendant would not want him called?

THE WITNESS: Yes, that's – that's a significant possibility.

> THE COURT: If you had free reign, would you have called the other attorneys as character witnesses?
>
> THE WITNESS: Yes.

May Hearing at 44-47.

While state defense counsel suggests he would have called Doctor Lee on a retrial, this court concludes on the basis of the evidence that that is not the case. In the first place, it is unlikely that the doctor could have added information on the point of physical capacity that was not already available by the jury's own observations. A jury may consider what it observes of a defendant and his apparent physical capacity even though he does not take the stand. *See, e.g.*, JOHN H. MANSFIELD, NORMAN ABRAMS, MARGARET E. BERGER ET AL., EVIDENCE: CASES AND MATERIALS 134-36 (9th ed. 1997); *United States v. Schipani*, 414 F.2d 1262, 1268 (2d Cir. 1969); *United States v. Schipani*, 293 F. Supp. 156, 163 (E.D.N.Y. 1968), *aff'd*, 414 F.2d 1262 (2d Cir. 1969). As noted by the district court in *Schipani*:

> The trier's observation of the non-witness defendant's demeanor and general appearance may be- - and almost invariably is- - considered by him in evaluating evidence introduced at the trial. *See, e.g., Stein v. People of State of New York*, 346 U.S. 156, 181, 73 S. Ct. 1077, 97 L. Ed. 1522 (1953) (trial judge and jury in better position than appellate court to determine if confession coerced by observing parties; defendants did not take stand); *Morrison v. People of State of California*, 291 U.S. 82, 94, 54 S. Ct. 281, 78 L. Ed. 664 (1934) (jury might find defendant was oriental even if he did not take stand); *State v. McKinnon*, 158 Iowa 619, 138 N.W. 523 (1912); [Jerome] Michael & [Mortimer J.] Adler, *Real Proof*, 5 VAND. L. REV. 344, 365 (1952).

*Schipani*, 293 F. Supp. at 163.

In the second place, petitioner's work for various lawyers serving summonses, subpoenas and the like suggested that he could get around well enough.

In the third place, evidence of his work in the church moving furniture and cleaning up

-11-

supported the conclusion of less than full disability.

In the fourth place, petitioner's prideful insistence that his numerous lawyer-friends not be called as character witnesses made it unlikely that he would have allowed the doctor to be called as a witness.

Most importantly, in the fifth place, the calling of Doctor Lee would have opened the door to rebuttal by the prosecution using its own doctor. Yet, as will be recalled from the record, defense counsel had been successful in keeping out testimony of a prosecution medical witness supporting physical capacity. To have allowed this medical issue to dominate the trial would have been dangerous to defendant, as any competent attorney would surely have understood. It would have focused the jury's attention on capacity and what a sexually aroused male might be capable of, instead of on the lack of credibility of a drug and alcohol intoxicated woman with almost no objective evidence to back up her charges. Even her bruises were connected to petitioner only by her own testimony. There was no semen, no pubic hair, no stained clothing, and no other witnesses to the events.

Calling a physician to testify to lack of capacity of petitioner would not have been likely to have assisted the defense case. While bruises and other injuries on the complaining witness supported her testimony on the nature of the assault, defense counsel's examination of a hospital physician had thrown doubt on the timing and source of these injuries. In addition to the observable physical ability or lack of ability of defendant to subdue his accuser, there is no suggestion that petitioner's claimed incapacity included a relevant sexual defect.

The main chance for a verdict of not guilty or a hung jury lay in the substantial possibility that jurors would conclude that the complainant either placed herself voluntarily in harms way

and that she signified consent, but that the sexual encounter became rougher than she had expected or, alternatively, that the rape never happened. Defense counsel sensibly used defendant's cane not to show inability to commit the crime, but to show that it was not used to threaten the complainant or inflict harm on her. State Trial Transcript ("Trial Tr.") at 217.

The jury can be assumed to have taken into account what it knew about real life - - i.e., that many disabled, and even wheel-chair-bound people have great strength. *See, e.g.,* MARGARET A. BERGER ET AL., FEDERAL EVIDENCE, § 201.03[4] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 1997); Jerome Michael and Mortimer J. Adler, *The Trial of an Issue of Fact: I,* 34 COLUM L. REV. 1263 n.57 (1934). The example of President Franklin Delano Roosevelt's physical strength is well known in our society.

In short, the Doctor Lee issue is of no significance in this case. It should have not the slightest effect in an evaluation of the merits of the petition: trial counsel more than met minimum constitutional requirements in his defense of petitioner.

2. Based on Second Post-Remand Evidentiary Hearing

To cover every possible argument and hearing issue, this court directed counsel to try to find Doctor Ernesto Lee and produce him for a second evidentiary hearing so his possible testimony could be put on the record. He could not be produced because he was dead. Counsel sought testimony of another possible treating physician, Doctor Malick Akhpar; he too had died. Neither Doctor Lee's nor Doctor Akhpar's medical files covering petitioner could be located. Hospital records of petitioner could not be found. Nothing at the second post-remand evidentiary hearing or subsequent research by counsel affects this court's decision based on the state record and first post-remand evidentiary hearing. *See supra* Part III. A. 1.

3. Reasonable Decision of State Trial Counsel

The court is satisfied that petitioner's state counsel exercised reasonable calculated discretion in not calling a physician to support the claim that the petitioner was incapable of committing the crime because he was "disabled." Counsel had ample opportunity to evaluate petitioner's physical capacity to attack and subdue the complainant. The jury also had that opportunity while it observed the petitioner during the trial.

B. Conflict of Interest

As to the charged conflict of interest, there is not a scintilla of evidence of a conflict. May Hearing at 22-26, 43-45. In fact, counsel had employed petitioner to assist in legal legwork. He had an affection and a sense of responsibility for his client. There is no basis for any suggestion that defense counsel sold out petitioner or that any rational person would think so.

There was no showing of any possible conflict because there was no evidence that state counsel for petitioner was associated directly or indirectly with the complainant. There was no defense "team." No source of possible conflict existed. No "plausible" alternative strategy that counsel could have pursued suggests a possible conflict. *See, e.g., Eisemann v. Herbert*, 401 F.3d 102 (2d Cir. 2005) (concluding that existence of an extraordinary and bizarre conflict did not effect strategy). Even under the Court of Appeals for the Second Circuit's less "demanding approach" to conflict claims, *id.* at 107, requiring a suggestion of an alternative defense that was objectively reasonable, no such strategy was viable. No conflict could have affected the representation. *See id.* at 108.

C. Skillful Defense

The trial record indicates an adroitly conceived, well advised and appropriately executed

defense. In his opening remarks to the jury, counsel properly stressed the complaining witness's smoking of marijuana and drinking, Trial Tr. at 169, suggesting that the charged rape was largely a figment of her imagination and that she was not a reliable person. This theme was repeated in a fierce cross-examination. *Id.* at 212-28, 230-372; *see also id. at* 392-94 (cross-examining prosecution witness, Doctor Smith, as to lack of bruises observed at the hospital). In a sound summation defense counsel's emphasis was on the conflict of credibility and lack of confirming evidence, all supporting a reasonable doubt. *Id.* at 629-66.

The police officer who investigated, the son and daughter of the complainant, and the doctor who saw the complainant at the hospital after the alleged rape, were called by the prosecution. They were all properly cross-examined. *See id.* at 391-98, 404-10, 419-23, 445-64.

The defendant took the witness stand - - undoubtedly on his own insistence - - and articulately denied that he had committed the alleged rape. He was appropriately led through his testimony on direct. *Id.* at 485-556. Defendant's alleged physical disabilities were fully developed by his testimony. *Id.* at 493-96, 553-54. So, too, were defendant's religious objections to having sex with a woman in her menses - - that she had testified was her then condition. *Id.* at 497-98, 514-15. He testified that he tried to eject her from his quarters because she insisted on using drugs, *id* at 541, that he did not have sex with her, and that he never struck her or removed her clothes or tampon.

Other indications of proper preparation by defense counsel were the additional proof he skillfully used. It included the testimony of Bishop Owen Augustin, as to the nature of defendant's quarters, throwing some doubt on the complainant's description. *Id.* at 470-84.

As already noted, the trial court rejected the prosecution's request for a rebuttal witness

physician who would testify that petitioner had the physical capacity to subdue and rape the complainant. *Id.* at 588-95. The court denied the prosecution's application. *Id.* at 595. Had the defense put on a physician, as petitioner contends it should have, the prosecution might well have strengthened its case by calling its own physician. The defense also strongly objected to a rebuttal witness who would have testified that she observed defendant doing heavy work requiring substantial strength and agility. *Id.* at 600-03. This rebuttal witness was well cross-examined. *Id.* at 613-19.

No physical evidence of the alleged rape was introduced. There was no DNA evidence from semen; the complainant testified that a condom was used on the two separate alleged coital contacts. Nor was there produced pubic hairs, relevant soiled clothing or bedding traceable to the incident. This lack of evidence supported an acquittal. Jurors tend to rely on such scientific evidence in rape cases and will tend to discount the probability of guilt in a close case where it is absent. *See, e.g.*, DNA AND CRIMINAL JUSTICE SYSTEM: THE TECHNOLOGY OF JUSTICE (David Lazer ed., 2004); *cf.* Margaret A. Berger, *Lessons from DNA: Restriking the Balance between Finality and Justice, id.* at 109, 119 (recognizing need for counsel in state post-conviction remedies because of subtle issues).

D.  Evidence of Guilt

The main issue was one of credibility of the accused and of his accuser. Whatever errors were arguably made by state defense counsel, they would not have affected the ultimate result. *See, e.g., Benn v. Greiner*, 402 F.3d 100 (2d Cir. 2005). Once the jury decided to believe the complainant, petitioner's fate was sealed.

E.  Danger in Uncritical Acceptance of *Mea Culpa* Claims of State Counsel

In this case, as in a substantial number of other habeas litigations, state trial counsel indicated to the state court that he had made a serious error as an advocate. *Mea culpa* statements made by counsel in state motion papers and orally, or by letter, affidavit or testimony in federal habeas cases, can not be taken at face value. See, e.g., analysis and evidence *supra* Part III.A. Counsel may well be motivated by a desire to help a former client—or, contrariwise, counsel's own reputation if he or she denies errors in judgment. *But cf., e.g., Henry v. Poole*, No. 03-2884, 2005 WL 1220468, at *22 (2d Cir. May 24, 2005) ("Ordinarily, when we have found potential merit in a claim that counsel has provided constitutionally ineffective assistance, we do not order the granting of habeas corpus without offering counsel an opportunity to present evidence, in the form of live testimony, affidavits, or briefs. In the present matter, however, the record already contains Watts's explanations for his presentation of the [misguided] alibi defense, to wit, his affidavit in Henry's § 440.10 proceeding. Accordingly, we conclude here that no further hearing is necessary . . .[, and grant the writ conditionally on a failure to provide a trial within 90 days]." (internal quotation marks and citations omitted)).

F. Advantage of New York State's Over Court of Appeals for the
Second Circuit's Approach

Skepticism is particularly called for when an excellent attorney doing a highly credible job for the defense suddenly pleads ineptitude. In this respect, the New York State's standard for determining competent representation seems more useful than the federal standard. *But see Henry v. Poole, id.* at *17-*20. The federal test is: (1) "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms," and (2) "the deficient performance prejudiced the defense," i.e., "there is a reasonable probability that . . . the

result of the proceeding would be different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). The state test is: "the evidence, the law, and the circumstances of a particular case, viewed in the totality and as of the time of the representation, reveal that the attorney provided meaningful representation." *People v. Baldi*, 54 N.Y.2d 137, 147 (1981). The New York State test should be deemed to satisfy federal constitutional standards in cases such as the instant one. An *en banc* Second Circuit Court of Appeals decision or a decision by the Supreme Court itself appears necessary to achieve a desirable amalgamation of the two tests. *Henry v. Poole*, No. 03-2884, 2005 WL 1220468, at *20 (2d Cir. May 24, 2005) (noting that rule of Second Circuit Court of Appeals cannot be changed except in *en banc* proceeding). The distinguished New York courts and New York's excellent criminal justice system deserves more in the way of comity than is afforded in some federal proceedings. *See In re Habeas Corpus Cases*, 298 F. Supp. 2d 303, 306-07 (E.D.N.Y. 2003) ("[H]igh level of criminal justice administered in New York State courts. . . . Defense counsel . . . are usually effective and highly professional in protecting the rights of their clients in the state courts.").

## IV. Conclusion

The petition is dismissed. A certificate of appealability is granted on petitioner's claims of inadequacy of state trial counsel. No other issue raises a possible valid constitutional claim.

SO ORDERED.

_____
Jack B. Weinstein
Senior United States District Judge

Dated: June 9, 2005
      Brooklyn, New York